STATE OF MAINE
KENNEBEC, ss

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. AP-11-052
NM —KEN— 3/18/2013

CITY OF HALLOWELL,
VERONICA MOLLOY,
ROBERT STUBBS,
JANIS CROSS,
DOROTHY MITHEE,
and GERALD MAHONEY,

       Plaintiffs

v.

       DECISION AND ORDER

GREATER AUGUSTA
UTILITY DISTRICT,

       Defendant

Before the court is the plaintiffs' appeal,[1] pursuant to Rule 80B, of the 8/15/11 decision of the defendant Greater Augusta Utility District (GAUD). (Def.'s Ex. 2 at 240-42.) Pursuant to that decision, effective October 3, 2011, GAUD increased sewer rates by 35% and stormwater rates by 40%. (Def.'s Ex. 2 at 214, 240-42.)

The plaintiffs challenge three allocation factors used by GUAD to determine the 2011 rate increase: allocation factors F, G, and H. Allocation factor F, customer accounts, allocates 84% of billing costs to sewer customers and 16% to stormwater customers, based on the expenses involved with customer accounts. (Def.'s Ex. 2 at 183.) The total cost of customer billing is $281,411.00. (Def.'s Ex. 2 at 207.) The total operations and maintenance budget is $3,659,193.00 (Def.'s Ex. 2 at 209.)

---

[1] The defendant filed a motion to dismiss based on standing. The court granted the motion as to Hallowell Citizens for Fair Sewer Rates and denied the motion as to the City of Hallowell. The plaintiff then amended its complaint to add Veronica Molloy, Robert Stubbs, Janis Cross, Dorothy Mithee, and Gerald Mahoney as plaintiffs. Ms. Mithee had died by the date of the hearing in this appeal.

1

Allocation factor G allocates 63% of operation and maintenance expenses, some capital expenses, and some debt service costs to sewer customers and 37% to stormwater customers based on the total flow of sewer and stormwater at the treatment plant. (Def.'s Ex. 2 at 211.)

Allocation factor H allocates 44% of the costs of the Bond Brook CSO Project to sewer customers and 56% to stormwater customers based on construction allocations of the project. (Def.'s Ex. 2 at 183-84.)

The plaintiffs argue that these incorrect allocation factors result in GAUD sewer customers paying higher rates than they should pay, contrary to the legislative mandate. (Def.'s Ex. 1.)

The court has considered the testimony, exhibits, and written arguments. For the following reasons, the 8/15/11 decision of GAUD is affirmed.

FINDINGS

In 2007, the sewer, water, and stormwater operations of the Augusta Sanitary and Water Districts and the sewer operations of the City of Hallowell were merged and GAUD was created. (Def.'s Ex. 1.) This is a combined sewer system because the pipes carry sewer and stormwater. (Def.s' Ex 2 at 89.) The legislation provided, in part:

> **Sec. A-1. Territorial limits; corporate name; purpose.** The inhabitants and territory of the City of Augusta and the City of Hallowell constitute a body politic and corporate under the name of the Greater Augusta Utility District, referred to in this Part as "the district" for the following purposes:
>
> . . . .
>
> 2. To construct, maintain, operate and provide the sewers with all their appurtenances, but not stormwater drainage provided under subsection 3, inside the City of Augusta, the City of Hallowell, the Town of Chelsea and all that area in the Town of Farmingdale . . .

2

3. To construct, maintain, operate and provide the stormwater drainage system with all its appurtenances in the City of Augusta only . . .

**Sec. A-16.  Payments of rates required; purpose of revenue generally.**

. . . .

The wastewater rates must be established to provide revenue for the following purposes:

A. To pay the current expenses of operating and maintaining the sewerage, drainage and treatment systems of the district;

B. To provide for the payment of interest and principal on the indebtedness created or assumed by the district;

C. To provide funds for paying the cost of all necessary repairs, replacements or renewals of the sewerage, drainage and treatment systems of the district; and

D. To pay or provide for all amounts that the district may be obligated to pay or provide by law or contract, including any resolution or contract with or for the benefit of the holders of its bonds and notes.

3. For purposes of establishing water and wastewater rates, all the district's costs of service must be equitably allocated between water and wastewater operations to minimize any cross-subsidies between water ratepayers and wastewater ratepayers.  The district shall maintain records supporting and documenting the methods used to allocate all costs between the water and wastewater operations.

4. For the purpose of establishing wastewater rates, all of the district's costs of service must be equitably allocated between sewerage service and stormwater service and the cost of stormwater service must be borne by the ratepayers of the City of Augusta. The district shall maintain records supporting and documenting the methods used to allocate all costs between sewerage service and stormwater service.

(Def.'s Ex. 1 at 1, 2, 10-11.)

A rate increase took place in 2006, before GAUD was formed.  A rate increase was anticipated again in 2011, primarily because of a 17 million dollar construction

project.[2] (Def.'s Ex. 2 at 251-52.) Prior to the GAUD Board's vote on the 2011 rate model, public hearings were held. Plaintiff Janis Cross spoke at the 7/28/11 hearing. (Def.'s Ex. 2 at 271.) Hallowell City Councilor Phillip Lindley spoke at the 7/28/11 meeting, although he did not identify himself as a representative of the City of Hallowell. (Def.'s Ex. 2 at 269-71.) Dorothy Mithee spoke in opposition to the rate increase at the 8/15/11 hearing. (Def. Ex. 2 at 240.) The Board requested alternatives but received none. No alternative flow calculation, included in allocation factor G, was presented.

1. Dennis Kinney

Dennis Kinney began working for public utilities with General Waterworks Corporation. During that employment, he received his wastewater treatment license and water operator's license, which permit him to operate water and wastewater treatment systems throughout Maine. For the past twenty-five years, he has worked for the Hallowell Water District (HWD) and has operated, maintained, and managed the water system, the sewer system, and the stormwater collection system for Hallowell. During this time, he has completed cost of water, treatment, and service studies; has been involved in water, sewer, and stormwater rate cases; and has been responsible for HWD's financial documents. He was a nonvoting member of the GAUD Board of Trustees during the Board's first year.

Sewer services include discharge from toilets, sinks, and showers into the public sewer system. Stormwater includes rainwater that drains into the collection system. Prior to 1972, Hallowell owned a combined system in which sewer and stormwater combined in one pipe. In 1972, Hallowell and the HWD constructed two separate systems, which involved upgrades to the parts of the system that previously were

---

[2] Mr. Kinney believes the cost of the project is closer to 30 million dollars.

4

combined. Today, the stormwater does not combine with the sewer in Hallowell. In Augusta, stormwater and sewer combine at the treatment plant.

In a 2006 rate case, Augusta allocated costs between sewer and stormwater customers. A rate study identified the Bond Brook Combined Sewer Overflow (CSO) project as a stormwater only project.[3] The resulting rate increases from the 2006 case included 7% for sewer and 30% for stormwater. The stormwater rate increase encompassed construction and bond costs from the Bond Brook CSO project.

In 2007, when GAUD was formed, the HWD was very interested in transferring its sewer service to GAUD but wanted to ensure that only Augusta customers paid for stormwater services. According to Mr. Kinney, the Charter addressed the concerns of the HWD regarding uniform rates. (Def.'s Ex. 1, §A-16(3).)

In 2011, rate increases of 35% for sewer services and 40% for stormwater services were implemented. GAUD intended to raise eight million dollars from the rate increase. According to Mr. Kinney, the rate study determined the parts of GAUD that were sewer only, stormwater only, or combined sewer and stormwater. The study used nine allocation factors to allocate costs among those parts. The plaintiffs do not dispute the amount of revenue sought by GAUD but do dispute the allocation of that revenue between sewer customers and stormwater customers through allocation factors F, G, and H.

Allocation factor F, accounts, includes costs for managing customer accounts, billing, and collection of money. The plaintiffs argue that 5,098 customers were counted as sewer service only customers; those customers should have been counted as sewer

---

[3] A similar CSO abatement project, the Rail Trail in Augusta, was in 2006, and continues to be, allocated 100% to stormwater customers. (Def.'s Ex. 2 at 210, West Side Consol. Conduit.) The sole function of the Rail Trail project was to contain stormwater overflows, just as with the new

and stormwater combined service customers. Accordingly, they argue, the allocation by GAUD of 84% to sewer services and 16% to stormwater services for the costs for accounts was not accurate and not equitable. Mr. Kinney prepared a revised allocation for factor F and concluded that the allocation should have been 49% to sewer services and 51% to stormwater services. (Pls.' Ex. 2.)

Mr. Kinney further stated in response to Mr. Tarbuck's testimony, discussed below, that allocation factor F should be based on number of customers or revenue needs. Mr. Kinney had not previously seen an allocation based on time devoted to handling different customers.

Allocation factor G includes costs within the treatment plant, including operating and maintenance costs. GAUD established that treatment plant flow on an average wet day had a threshold of 5.5 million gallons per day peak flow; an average dry day or sewer day was established as any amount less than 5.5 million gallons per day. The plaintiffs challenge this assumption because it does not account for stormwater flow in a sewer day and does not account for I & I, which is inflow and infiltration into the sewer and stormwater pipes. (Pls.' Ex. 29.) I & I is very fact specific to the collection system involved and can vary based on the age and size of the pipes, among other things. GAUD allocated these costs through allocation factor G as 63% sewer and 37% as stormwater.

Mr. Kinney revised the allocation in factor G. (Pls.' Ex. 3.) He began with the total annual flow at the treatment plant from stormwater and sewer. Trunkline flows were subtracted. He included known metered flow from customers. He also allocated a portion of I & I to sewer based on data generated from measured sewer flows from

---

Mill Park storage facility in the Bond Brook project. The remainder of the Bond Brook project was allocated based on flow-based costs of operating the project system.

6

three meters at the Hallowell Pump Station. (Pls.' Ex. 7.) The difference between the flow from the pump station and the amount of metered flow, according the Mr. Kinney, is I & I. He determined that I & I for fifteen years from Hallowell's sewer system was 24%. He rounded up and factored in an I & I rate of 25%. (Pls.' Ex. 27.) He then subtracted the sewer flow and I & I from the sewer and stormwater flow to the treatment plant minus the trunkline to determine stormwater flow. Mr. Kinney's reallocation of factor G was 51% to sewer and 49% to stormwater.

Allocation factor H, Bond Brook CSO III Project includes the capital cost of a stormwater management project designed to eliminate two old CSOs along the Bond Brook. (Def.'s Ex. 8.). CSOs are combined sewer overflows or discharges of fluid from a collection system during a high rain event when the system cannot handle the amount of water. According to Mr. Kinney, the Department of Environmental Protection wanted the CSOs that discharged into the Bond Brook and the Kennebec River eliminated.[4] As part of the project, two combined sewer and stormwater pump stations were consolidated.

During the 2006 rate case, the Bond Brook CSO Project was allocated 100% to stormwater. Other CSO projects prior to Bond Brook were similarly allocated.

In 2011, the Bond Brook Project was divided into five categories and allocations made based on the treatment plant flow for four categories. (Pls.' Exs. 4, 5.) Both GAUD and Mr. Kinney allocated 100% of the Mill Park storage facility to stormwater. GAUD allocated the remaining four categories in factor H as 60% sewer and 40% stormwater. In the final allocation including all five categories, GAUD allocated 44% of the Bond Brook CSO Project costs to sewer services and 56% to stormwater services.

---

[4] Presumably the DEP objects to the untreated sewer in the combined sewer overflow. GAUD's argument that sewer customers, therefore, are primarily responsible for the need to eliminate

The plaintiffs challenge this allocation under factor H and argue that a treatment plant is designed differently from a collection system. Mr. Kinney determined that the Bond Brook facility was designed to operate at full capacity during a high rain event one time per year for two hours and handle 22.1 million gallons per day of flow, 19.6 million gallons per day of stormwater and 2.5 million gallons per day of sewer; the stormwater and sewer flow to the treatment plant and are not discharged. (Pls.' Ex. 17.) The actual capacity is 11.3% sewer flow and 88.7% stormwater flow. Mr. Kinney believes the designed peak flow is the appropriate way to allocate factor H, not average flow at the treatment plant. Mr. Kinney would allocate 100% of the Bond Brook project costs to stormwater "because that's what's driving all of this project . . . that's the only reason it's built."

Mr. Kinney prepared a revised allocation for those four categories and concluded that the allocation should have been 11.3% to sewer services and 88.7% to stormwater services. (Pls.' Ex. 4.) Mr. Kinney's final allocations for factor H were 8% sewer and 92% stormwater. (Pls.' Ex. 4.)

Mr. Kinney applied his revisions to factors F, G, and H to the model used for the 2011 rates. He determined the rates that should have been imposed would have been an 81% increase for stormwater customers and a 1% decrease for sewer customers, as opposed to the increase of 40% for stormwater customers and 35% for sewer customers approved by GAUD. (Pls.' Ex. 1 at 8.)

The new rates became effective on October 3, 2011. Mr. Kinney concluded the sewer customers have been overcharged by $943,564.00. Because the new rates will be in effect for five years, Mr. Kinney recommended that sewer customers receive a refund of $235,891.00, which is the overcharge divided by four, during each of the next four

the CSOs is not without merit. (Def.'s Reply Br. at 9.)

8

years. This results in a rate increase of 91% for stormwater customers and a 10% rate decrease for sewer customers during the next four years, based on pre-October 2011 rates. (Pls.' Ex. 6.) Mr. Kinney believes his revisions provide that the Hallowell sewer customers would not be required to pay for stormwater services in Augusta and his revisions, therefore, meet the requirement of GAUD's Charter. (Def.'s Ex. 1.)

2. Ronald Norton

Ronald Norton has a Ph.D. in economics from Boston College. (Pls.' Ex. 13.) He is designated as a certified rate of return analyst in the Society of Utility and Regulatory Financial Analysts. He teaches economics at various institutions. He also has worked as a house analyst and now as a consultant to the Public Utilities Commission (PUC). He has been involved in approximately 50 utility rate cases with the PUC, which involve the allocation to customers of increased rates. He had never testified previously in a case involving apportionment of sewer charges. He has never worked for a sewer utility and has never reviewed a sewer rate case or had experience with apportioning sewer and stormwater flow.

Dr. Norton was hired by the plaintiffs to assist Mr. Kinney in examining the 2011 rate model. Dr. Norton tried to understand how the Raftelis model was set up and determine whether certain "stylized" aspects of the model were reasonable, fair, and equitable.

He believes the cost causation principle is fundamental to utility regulation. He labeled this principle as common sense: determine who is responsible for the need for a particular expense. He determined that allocation factors F, G, and H did not follow the cost causation principle directly and allocation factor E did not follow that principle indirectly because factor E encompasses factor G. Dr. Norton agreed that the cost causation principle is not an exact science and that assumptions have to be made. For

9

example, there is no method to measure sewer and stormwater as they enter the treatment plant.

With regard to allocation factor F, Dr. Norton concluded the allocation of customer accounts as 86% sewer and 14% stormwater was grossly inequitable. He complained that the 759 sewer only customers were combined with the 5,098 combined sewer and stormwater customers and designated as sewer. He concluded that the plaintiffs' revision to allocation factor F was a more equitable allocation of costs because the combined accounts were added to sewer and stormwater. (Pls.' Ex. 2.)

With regard to allocation factor G, Dr. Norton agreed that the allocation of operation and maintenance expenses based on average annual flow at the treatment plant was appropriate.[5] He disagreed with the calculation of average annual flow, which he described as confusing, convoluted, and unnecessarily complex. Once again, he worked with Mr. Kinney to revise allocation factor G. (Pls.' Ex. 3.) The trunk line was subtracted from the total flow through the treatment plant. Using water utility readings as a reasonable estimate of sewer discharge, the sewer flow was adjusted upward by including a rate of 25%, discussed above, for I & I. The sewer flow was subtracted from the adjusted treatment plant flow to obtain the stormwater flow. The resulting ratio was 51% sewer and 49% stormwater, as opposed to GAUD's ratio of 63% sewer and 37% stormwater.

With regard to allocation factor H, Dr. Norton concluded that the allocation of the capital costs for the Bond Brook project based on average annual flow at the

---

[5] Dr. Norton agrees that operating and maintenance expenses, including those for pump stations, should be allocated on the basis of average flow, although based on a different ratio. (Pls.' Ex. 1 at 3.) If a new pump station were built, however, he believes peak flow must be considered because the new pump station would be a capital investment. The size of the design determines cost. With regard to debt service, however, he used allocation factor G for capital

10

treatment plant was not equitable. He worked with Mr. Kinney to revise allocation factor H. (Pls.' Ex. 4.) He determined the capacity of the entire system was designed for a major storm day of 22.1 million gallons. He assumed that all aspects of the project, shown on defendant's exhibit 8, were designed to handle 22.1 million gallons per day.[6] (Def.'s Ex. 8.) He concluded that the investment is made to handle the presence of stormwater during such an event and, accordingly, the allocation must be made based on peak flow and not average flow. He did not consider an incremental cost increase based on the capacity of the system. He agreed that if his assumption regarding the capacity of the entire system was wrong, his revision of allocation factor H might change.

Dr. Norton and Mr. Kinney inserted the plaintiffs' revisions of the GAUD allocation factors F, G, and H into GAUD's Raftelis model. (Pls.' Ex. 1.) The resulting rate changes included a rate increase of 91% for stormwater customers and a rate decrease of 10% for sewer customers. Based on the plaintiffs' revised allocation factors, Dr. Norton agreed with Mr. Kinney that during the first year of the five-year effective period for these rates, the sewer customers have overpaid $943,564.00 and that the overpayment should be recovered during the next four years at the rate of $235,891.00 per year to avoid "rate shock."[7] (Pls.' Ex. 6.)

---

projects, including a treatment plant upgrade, a pump station replacement, and a CSO3. (Pls.' Ex. 1 at 7.)

[6] The sewer and force main are designed to handle 2.5 million gallons per day.

[7] Dr. Norton agreed that his assessment that the rates in 2011 should have been an 91% increase in stormwater rates and a 10% decrease in sewer rates would have resulted in "rate shock" but

11

### 3. Harold Smith

Harold Smith is a vice president with Raftelis Financial Consultants in North Carolina. (Pls.' Ex. 26.)[8] Raftelis does financial consulting for water and sewer utilities nationally. Ninety percent of Raftelis's work is water and sewer rate setting; ninety-nine percent of the firm's clients are municipal utilities. Seventy-five percent of Mr. Smith's time is devoted to stormwater and sewer rate setting for utilities. His work includes allocating costs between stormwater and sewer customers by determining why the costs are incurred and efficiently allocating the costs without incurring more costs in the process. He has worked for approximately 200 utilities in New England or in southwestern United States.

Mr. Smith's relevant project experience includes utilities with separate sewer and stormwater systems and a utility with a combined system. He has done that combined system utility's water rate filings for ten or twelve years. He has testified previously regarding allocation of costs between sewer and stormwater for rate making.

In calculating rates for this case, he employed the cost causation principle, discussed above, in which costs are allocated to the customers who cause the cost to be incurred. Equitable allocation of costs among different customers is a goal in rate making.

In 2011, he was contacted by GAUD. He was asked to use the 2006 rate study and create a model that calculated rates based on that 2006 study and update some of the allocation factors based on the current situation. He reviewed a hard copy of the

---

that is preferable to allowing some customers to subsidize other customers. A cross subsidy is to be avoided. He agreed there was no evidence that GAUD intended a cross subsidy.

[8] Mr. Smith did not prepare a resume specifically for this case. Plaintiff's exhibit 26 was likely taken from the Internet. He has worked on at least 200 projects, not three.

12

2006 study but was unable to review the schedules or rework the spreadsheets. He saw nothing of concern during his review of the 2006 study.

The preparation of the finalized rate model took approximately four months. He went through several iterations of the model and corrected, improved, and added functionality to the model. He worked with GAUD staff to ensure the new model was consistent with the previous model and that he had the most current data with respect to allocation factors. He concluded that the final rate model resulted in fair and equitable rates for all GAUD's sewer and stormwater customers. (See Def.'s Ex. 2 at 190-218.)

The final rate model consists of twelve schedules. (Def.'s Ex. 2 at 190-218.) GAUD's budget was divided, essentially, into three categories. (Def.'s Ex. 2 at 72, 174.) Raftelis developed allocation factors to apportion expenses between sewer and stormwater customers. The factors were applied to the three budget categories.

Schedule 1 shows GAUD's sewer and stormwater annual operating and maintenance expense budget projected for five years beginning in 2011. Using 2013 as the rate year, schedule 1 reflects rates that will be in effect for the five-year period for the various categories listed. (Def.'s Ex. 2 at 191-96.)

Schedule 2 shows the plan for capital projects for the next few years. The source for the projects is either cash or loans. (Def.'s Ex. 2 at 197.)

Schedule 3 shows GAUD's sewer and stormwater debt service from 1998 to 2030. The rate year again is 2013 and shows the total payments of principal and interest required from GAUD. (Def.'s Ex. 2 at 198-200.)

Schedule 4 shows accounting for revenue offsets, which is an offset to the revenue that must be recovered from rates. (Def.'s Ex. 2 at 201-04.)

Schedule 5 identifies the allocation between stormwater and sewer of costs for the day-to-day operations of GAUD. (Def.'s Ex. 2 at 205-09.) These are the amounts that will be collected from sewer and stormwater customers. Allocation factor G for the treatment plant, 63% sewer and 37% stormwater, is based on the flow at the treatment plant. (Def.'s Ex. 2 at 205.) This is a typical method for allocation of costs to ensure the person causing the cost pays for the cost. Similarly, the same allocation factor is used for pump stations. The primary cost for a pump station is electricity and power demand depends on the amount of flow pumped. (Def.'s Ex. 2 at 206.) The same allocation factor is used for sanitary pipes. (Def.'s Ex. 2 at 206.) Utilities, in general, do not have detailed and specific data about underground assets that might provide another method of analysis.

In schedule 5, allocation factor C, 100% stormwater and 0% sewer, is used for catch basins and storm pipes. (Def.'s Ex. 2 at 207.) Catch basins and storm pipes are used only for the collection of stormwater.

In schedule 5, allocation factor F, 84% sewer and 16% stormwater, is used for customer accounts. (Def.'s Ex. 2 at 207, 211.) This allocation is based on the number of customers; the amount of flow generated by a customer is not related to the cost of billing. Mr. Smith agreed that if the account numbers he used were not representative of the actual account numbers, he would have to reexamine that allocation.

In schedule 5, allocation factor E, 42% stormwater and 58% sewer, is used for "admin and general." (Def.'s Ex. 2 at 208.) This allocation is based on the allocation of all other operating and maintenance costs.

The last page of schedule 5 shows the total rate revenue requirements for operating and maintenance. (Def.'s Ex. 2 at 209.) This page shows also the amounts of

14

that total, which must be collected from stormwater customers and from sewer customers.

Schedule 6, debt services, reflects the allocation between stormwater and sewer of loan repayment for capital construction projects. (Def.'s Ex. 2 at 210.) Multiple allocation factors were used. Allocations are based on a determination of the part of the project related to stormwater and the part related to sewer. Some projects, such as the Bond Brook project, require more detailed analysis for allocation than would be available using the value of fixed assets. The total amount allocated to debt service must be collected from rate revenue.

Schedule 7 shows the allocation factors used to allocate different costs. (Def.'s Ex. 2 at 211.) Allocation factor G, 63% sewer and 37% stormwater, is based on a comparison of the average day measured flow at the treatment plant with the average day wet measured flow. Although GAUD's meter readings at the treatment plant does not distinguish sewer from stormwater flow, Mr. Smith developed this concept based on additional data available from GAUD, which is often not available from other utilities. Measured flow for an average day is a reasonable approximation and is determined by dividing by 365 the total annual flow to the plant, which includes a certain level of I & I[9] and probably some stormwater. Average day wet includes a day with significant stormwater and elevated I & I. The numbers used for that comparison include the measured flow for an average day, average day wet, average day dry, maximum day, and minimum day. The data, based on several years of recordkeeping

[9] It is possible to determine the amount of I & I in a system. No study of the amount of I & I in GAUD has been considered or performed. Mr. Tarbuck was unsure whether such a study would permit more precise allocations. Further, GAUD has not sought assistance to determine whether cost-effective ways to reduce I & I exist.

15

by GAUD employee, Michael Grove, was provided to Mr. Smith by GAUD. This calculation method has been used previously.

The ratio of the average day, 4.592 million gallons, and the average day wet, 7.31 million gallons[10], is 62.82 (rounded up) and results in the allocation factor G 63% (rounded up) allocation to sewer. This allocation is consistent with the 2006 allocation of 40% stormwater and 60% sewer, which was an indication to Mr. Smith that the allocation was appropriate. In setting rates, dramatic changes are to be avoided unless necessary.

Mr. Smith determined that the plaintiffs' reassessment of allocation factor G is atypical. (See Pls.' Ex. 3.) A determination of flow should be measured based on the flow that goes into the plant and not based on the flow into pipes. The meter at the plant is the best source of data for flow to the plant. Further, if the 25% figure for I & I is inaccurate, the entire allocation would be inaccurate.

Allocation factor H relates to the Bond Brook project[11] loan and provides an allocation of 44% to sewer and 56% to stormwater. (Def.'s Ex. 2 at 211.) The main CSO abatement component of the project was needed for storage during a heavy storm event. During such a storm, the system, including sewer and stormwater, backs up into the storage tank as opposed to the brook and the river. But because this storage tank is a stormwater project, the tank is allocated 100% stormwater.[12]

---

[10] This figure was provided by GAUD. GAUD staff, however, had no knowledge of the way in which Mr. Smith would use the data in his model.

[11] The Environmental Protection Agency is mandating that utilities deal with CSOs. Utilities are, accordingly, incurring new, additional costs and are determining the best procedures through which to recover these costs.

[12] 100% of the storage facility was allocated to stormwater because it functions only during storm events. Other aspects of the project function only during storm events but were not allocated as the storage facility was allocated.

The cost of the capital project would be allocated based on flow at the treatment plant, as the existing sanitary pipes are allocated. Mr. Smith determined it would be inappropriate to allocate the cost of the project based on the peak flow during a one time per year heavy storm event because the entire project, except for the storage tank, was not designed for that event. Instead, the project was designed for average flow through the system 365 days per year. Accordingly, the allocation should be made as with other costs based on a combined system. (Def.'s Ex. 2 at 208.)

Mr. Smith did not recall being told by GAUD that in 2006, the Bond Brook project was allocated 100% to stormwater. Even if he had been told that, he would not have included that allocation in his model because that allocation would not be appropriate based on his examination. The removal of the CSO was required because of DEP concerns with overflow of sewer into the Bond Brook and Kennebec River. Because an overflow of stormwater causes the overflow of sewer, the project can be considered as mandated by both sewer and stormwater.

Schedule 9[13] shows the calculation of the rate increases. (Def.'s Ex. 2 at 214.) For stormwater and sewer, the operating and maintenance figure from schedule 5 and the allocated debt service and cash funded capital figures from schedule 6 are added to provide the total requirements for stormwater and sewer. The revenue provided under existing rates is subtracted from the revenue required to provide the additional revenue required. Dividing the additional revenue required by the revenue under existing rates provides a rate increase of 35% for sewer and 40% for stormwater.

A total of $6,734,830 must be raised from the rate fares. (Def.'s Ex. 2 at 214.) In Mr. Smith's experience, most utilities would have simply raised all rates similarly for an

17

interim rate increase because many utilities do a cost of service study only every ten years. If that typical procedure had been used in 2011, GAUD would have increased rates for sewer and stormwater customers by 37%. Mr. Smith concluded that the effort made to allocate costs in 2011 resulted in a more fair determination of the rate increase for the two types of customers.

### 4. Brian Tarbuck

Brian Tarbuck is the general manager of GAUD. He was employed by the Augusta Water District from 2002 until the merger in 2008. He has a civil engineering degree and is a licensed professional engineer. GAUD employs 37 people and a few more than half are laborers.

Mr. Tarbuck is supervised by the Board of Trustees, which has seven voting members; six are from Augusta and one is from Hallowell. Before the Board made the final decision on the 2011 rate increases, Mr. Tarbuck compiled and delivered information to the Board. He was assisted primarily by Michael Grove, who has been the manager of the treatment plant for 28 years. Additional assistance was provided by Andy Begin, assistant general manager for GAUD; other GAUD personnel; Ralph St. Pierre, the assistant city manager and controller for Augusta, who provided financial data to the rate consultants; Greg Leighton, a consultant from Aqua Maine, a water utility; Raftelis; CDM, an engineering firm in Massachusetts; and Woodard and Curran, an engineering firm in Maine.

---

[13] Schedule 10 is revenue proof. (Def.'s Ex. 2 at 215.) Schedule 11 is bill impacts. (Def.'s Ex.2 at 216-17.) Schedule 12 is the trunkline budget. (Def.'s Ex. 2 at 218.) Except for a discussion regarding the factoring out of the trunkline budget, these schedules were not addressed.

18

Allocation factor F, 84% sewer and 16% stormwater, was determined very early in the 2011 rate case.[14] GAUD does not dispute that the Raftelis model was inaccurate because the numbers used were incorrect. Accordingly, the allocation based on the number of accounts is inaccurate.

GAUD believes the allocation itself is, however, equitable. The allocation was based on billing reports and, according to Mr. Tarbuck, represented an accurate distribution of actual costs of dealing with customer accounts. He stated that although it is a common practice in utility rate making to use a per customer calculation when allocating billing and collection work, this allocation based on actual costs of billing was discussed and reviewed internally, prior to the filing of this lawsuit. (Def.'s Ex. 2 at 183.) Employees in the billing department believed the allocation was reasonable. The office staff spends more time on sewer customers than stormwater customers. (Def.'s Ex. 2 at 207 (Salaries & Regular Wages, $96,404.00).) Based on workload for staff in the office, sewer customers require more work and more time, although no time study was performed. Amounts paid by stormwater customers are static.

Additional costs are also sewer related. GAUD pays the Hallowell Water District and the water division of GAUD for sewer meter readings. (Def.'s Ex. 2 at 207 ($65,245.00).) Lien expenses are predominantly sewer liens. (Def.'s Ex. 2 at 207 ($15,914.00).) Amounts for salaries and wages appear in other categories. (See e.g., Def.'s Ex. 2 at 206 (Pump Stations; Sanitary Pipes).) Employees record on a daily basis where they are working in the system. The hours worked are applied to the task.

Mr. Tarbuck reviewed the plaintiffs' revision of allocation factor F. (Pls.' Ex. 2.) He agreed with the number of sewer only customers in Hallowell. There are a few

---

[14] In the past, another method was used in which the costs of billing were divided by thirds and allocated one-third to water, one-third to sewer, and one-third to stormwater.

additional sewer only customers in Augusta but the number is not significant. He disagreed with the plaintiffs' estimation of the number of stormwater customers.

Allocation factor G, 63% sewer and 37% stormwater, is based on average day flow divided by the average wet day flow. (Def.'s Ex. 2 at 211-12.) The flow data at the plant, including the sum flow, the minimum flow for the day and the average and the average wet and average dry day flow, was provided to Raftelis by Mr. Grove. (Def.'s Ex. 6 at 7.) Mr. Grove maintains this data on an ongoing basis and has data from 1/1/00 to 5/9/11.[15] (Def.'s Ex. 6 at 2-7.)

The engineering term "Max q" represents the maximum flow observed at the plant during the day. (Def.'s Ex. 6 at 2.) A maximum flow equal to or less than 5.5 is classified as a dry day. (Def.s' Ex. 6 at 2.) A maximum flow equal to or greater than 9.0 is classified as a wet day using a conservative approach. Mr. Grove chose the cutoff numbers for representing a dry day and a wet day at the plant based on his years of experience. The total flow is recorded on the spreadsheet. Data points represent the number of dry days observed in a particular year. (Def.'s Ex. 6 at 1.) A correlation is expected between the number of dry days and the rainfall measured with rain gauges at the plant.[16] (Def.'s Ex. 6 at 1 (compare 2004 with 2005).) The term "%DWF" is determined by dividing the calculated dry weather flow by the average daily influent flow. (Def.'s Ex. 6 at 1 (Notes).)

Based on Mr. Grove's formula, the average dry flow,[17] 2.874 (sewer and minimal I & I), divided by the average daily flow, 4.592 (sewer and some stormwater), is 62.58.

_____

[15] The data was collected and Mr. Grove's calculations were made long before the need to increase rates in 2011.
[16] The fact that rain or snow fell during a dry day does not make the determination inaccurate. The issue is whether the precipitation affected the Max q. (Pls.' Ex. 29 at 5 (6/4/08).)
[17] This is Mr. Grove's method to isolate sewer.

20

(Def.'s Ex. 6 at 7.)[18] This calculation results in the determination of the sewer flow of 62%. (Def.'s Ex. 6 at 1.) Using these numbers in the calculations, the Raftelis calculation is within a tenth of a percentage point. (Def.'s Ex. 2 at 211-12.) The rate model divides the average day, 4.592, by the average wet day, 7.31, which results in 62.81. (Def.'s Ex. 2 at 167.) The percentages, after rounding, are the same. The two different methodologies were discussed with the Board. The formula of dividing average dry day by average wet day was presented by Mr. Smith but was not accepted or used. That calculation results in an allocation of 39.32% to sewer. (Def.'s Ex. 2 at 167.)

The discussion with the Board of the apportionment costs of the Bond Brook Project between sewer and stormwater for the combined sewer elements began in late 2010. The four main components of the project include: demolition of two pump stations; replacement of the Mt. Vernon interceptor; construction of a new pump station and force main; and installation of a storage facility. (Def.'s Ex 2 at 147; Def.'s Ex. 9.)

Woodard & Curran prepared a bid tabulation spreadsheet to allocate the costs of the contractor's bid for the Bond Brook project. (Def.'s Ex. 5.) The columns correspond to the categories in the memo provided to the Board. (Def.'s Ex. 2 at 147.) The engineers used their best professional judgment to allocate costs between combined sewer and stormwater only.

Michael Stein, from Woodard & Curran, determined that three of the four main components of the project should be allocated to sewer and stormwater. (Def.'s Exs. 9-10.) Because the combined sewer system carries both sewer and stormwater, GAUD tried to approximate a reasonable amount to assess to the stormwater customers who

---

[18] Mr. Tarbuck was confused and misspoke about these ratios during his testimony. (Tr. at 268-69; 383-85, 390-91.) Clearly, 4.592 divided by 2.874 does not equal 62.58. (Tr. at 270.) The exhibits provide an explanation of the calculations.

use that infrastructure. Mr. Tarbuck concluded that the allocation factors for the project reflect the function of the project.

For planning purposes for the Bond Brook Project, the Board determined to use 60% sewer and 40% stormwater. A stormwater study dated July 31, 2006, prepared for the District by Brown and Caldwell, was reviewed in preparation for the 2011 rate study. (Def.'s Ex. 4.) The City of Augusta flows are listed as 60% sewer[19] and 40% stormwater in that study. (Def.s' Ex. 4 at Table 4-1, 4-2.) This allocation was incorporated in the 2006 rate study and had been used by the Board for years. The allocation to the sewer flow from Hallowell was 5%. Adding the 5% to the 60% would be a reasonable approximation of the total amount of sewer flow, as is the Raftelis allocation of 63% to sewer and 37% to stormwater, and the historical use by the District of 60% to sewer and 40% to stormwater.

With regard to the plaintiffs' revision of allocation factor G, Mr. Tarbuck disagreed that the percentage of I & I in Hallowell is representative of I & I in the entire GAUD system. (Pls.' Ex. 3.) He believed it was unlikely that a small part of the system can be extrapolated to apply to the entire system. GAUD has many pump stations, with some sewer only and some combined stations. The Hallowell collection system is significantly smaller than the Augusta collection system. The GAUD stations would not mirror the operation of the Hallowell station because of considerations of geography, pipe age, pipe diameter, length of pipe, and pipe construction. Factors that dictate I & I are unique, based on each sub-collection area. Additionally, the Hallowell system is in better condition than the other parts of GAUD.

Mr. Tarbuck prepared a chart to illustrate the amount GAUD was billing from the Hallowell pump station as opposed to the amount GAUD was actually pumping on

22

a calendar year quarterly basis. (Def.'s Ex. 7.) On the exhibit, the red line represents the amount of sewer pumped from the Hallowell pump station. The blue line represents the amount of water billed to the Hallowell sewer customers, based on meter readings.[20] The data is shown for 2009 through 2011.[21]

The blue line is relatively consistent. The red line is variable because of I & I entering the system that does not flow through the billing meters. The excess flow, water that was pumped but not represented in billing statements, in 2009 was 45%; in 2010, 37%, and in 2011, 40%. (Def.'s Ex. 7.) The average is approximately 40%, which would be consistent with I & I, based on industry standards.[22] Depending on the location, studies show the range for I & I is 40 – 50%. The Wright-Pierce memo is consistent with the determination by Mr. Tarbuck that 40% is a reasonable number for I & I in the GAUD system. (Pls.' Ex. 30.)[23]

With regard to the plaintiffs' revision of factor G, (Pls.' Ex. 3.), assuming 1430 million gallons per year is accurate for the combined sewer and stormwater and based on the Raftelis rate model's calculation of flow of 63% sewer and 37% stormwater, there would be 901 million gallons per year of sewer flow. Assuming the metered sewer flow through the treatment plant of 552 million gallons per year is accurate, the amount of excess sewer flow is 39% (901 – 552 = 349 divided by 901). Mr. Tarbuck believes that number is more reasonable than 25% for I & I for GAUD, because of the combined system, which would result in more inflow.

---

[19] The terms sewer and sanitary wastewater are the same.

[20] It is assumed that the amount of drinking water from meter readings that enters the house will leave the house and enter the sewer.

[21] These were years with rain. (Pls.' Ex. 27.) Mr. Tarbuck agreed that weather and the recession could affect the results. He stated further that the data shows only the gallons of water pumped.

[22] I & I is unique for nearly every pipe.

23

With regard to allocation factor H, the Bond Brook project involves construction of a combined sewer system, a stormwater storage structure, and the elimination of pressure sewers and two pump stations.[24] The project includes the replacement of combined sewer lines along Mt. Vernon Avenue, through which flows sewer and stormwater from customers, I & I, and catch basins. (Def.'s Ex. 8.) The project also involves the removal of two pump stations and construction of a new pump station as a replacement for the two, which are past their useful life and could fail.[25] (Pls.' Ex. 19 at 7-7.) Replacement was required to accommodate sewer flow. Putting the required pipe in the ground is less costly than constructing two new pump stations as replacement for the two older stations. Pipe to the west of pump station #1 will be upgraded and enlarged to accommodate the area that includes the mall near I-95 and MaineGeneral Hospital.

The yellow area on defendant's exhibit 8 depicts twin 670 feet box culverts, which are ten feet wide and tall and are twenty feet underground. These will be used to store combined sewer when flow exceeds the capacity of the combined sewer pumped at the pump station. The pump station operates every day of the year. On a dry day, the pump station pumps sewer and some I & I but virtually no stormwater, the

---

[23] "At many municipal wastewater treatment facilities, over half the flow is clean groundwater (infiltration) and rain water or storm water (inflow)." (Pls.' Ex. 30.)

[24] Variables in the design include size of pipe, size of the storage facility, and capacity of the pump. No evaluation was done regarding whether the capacity of the collection system increased as a result of the project. It is unreasonable to assume that the capacity pipes and collection system increased by a factor of eight or nine. (But see Pls.' Ex. 17.) The function of the system works as previously but water is conveyed differently. Further, if the size of the pipe is increased by a factor of two, the costs of the project would not increase by that same factor. The cost of the pipe increases but other costs remain the same.

[25] According to Mr. Stein, other parts of the Bond Brook area infrastructure had an additional ten–fifteen years of useful life remaining in 2011. (Def.'s Ex. 10 at 2.) If some facilities were, therefore, replaced prematurely, the project as designed was installed as a cost-effective way to deal with CSO and combined sewer issues. Mr. Tarbuck noted that the ten-fifteen year remaining useful life opinion was Mr. Stein's opinion and his alone. A 1995 study concluded

24

combined sewer pipes carry sewer, and the force main[26] conveys water pumped from the pump station, which is part of the sewer system.

The December 2006 Long Term Control Plan was prepared by Earth Tech, Inc. and Brown and Caldwell, engineering companies, to assist with the 2006 rate study. (Pls.' Ex. 19.) The study provides that the CSO project must include an adequate upgrade to the dry weather wastewater infrastructure along Mt. Vernon Avenue. (Pls.' Ex. 19 at 4-2.) Dry weather wastewater infrastructure refers to sewer and minimal I & I, which is necessary for day-to-day operation of the system. The project is intended to address requirements of the dry weather wastewater and wet weather or CSO abatement needs. (Pls.' Ex. 19 at 7-7, 7-9.)

Three memos, two dated August 8, 2011 and one dated August 9, 2011, were prepared by Woodard & Curran. Mr. Tarbuck asked this engineering firm to recommend an allocation of costs for the Bond Brook project. These memos were provided to the Board to ensure the members understood the project and the cost allocation. (Def.'s Exs. 2 at 147; 9; 10.) In determining the 2011 rates and the allocation of costs, the Board considered that the project was addressing both sewer upgrades and control of CSO events.

The allocation of 60% sewer and 40% stormwater was used historically. The Raftelis rate allocation was 63% sewer and 37% stormwater. The Board continued to use the 60/40 allocation, as it had during the planning stage. If the Board had used the Raftelis allocation, allocation factor H would have had a higher percentage allocated to sewer and a lower percentage allocated to stormwater.

---

that the pump stations should be slated for replacement. (Def.'s Ex. 3.) Mr. Tarbuck believes it is irresponsible for a utility to allow components of a system to fail.

Mr. Tarbuck assessed the plaintiffs' revision of allocation factor H. (Pls.' Ex. 4.) He did not agree with the 22.1 million gallons per day as the total flow through Bond Brook. (Pls.' Ex. 19 at 5-7.) That figure represents the peak instantaneous flow that would be measured during a one year, two hour wet weather event design used for the Bond Brook project. Because the storm falls over a wide area, this flow is attenuated throughout the system. (But see Pls.' Ex. 19 at 5-9.) Approximately one million gallons per day of rain flow would be collected in the system during such an event.

The project was not designed to withstand 22.1 million gallons per day of flow. The proposed pump station could not pump 22.1 millions gallons in one day; it could pump 2.5 million gallons[27] in one day of combined flow.[28] The west side interceptor limits the capacity of flow to 2.5 million gallons per day. The project was not intended to increase the capacity of the Bond Brook collection system to 22.1 million gallons per day; GAUD built a 2.5 million gallon per day system. (Pls.' Ex. 17, Smaller pipe.) Excess will flow into the storage structure. (Def.'s Ex. 8.) If the storage facility is filled to capacity, additional water, after potable screening, will flow into the Kennebec River.

Pursuant to the 2006 long-term study, the proposed capacity of the storage tank is .4 million gallons. (Pls.' Ex. 19 at 5-8.) The calculations were refined and in 2011, the proposed capacity was revised to .8 million gallons. This proposed capacity was rounded up to 1 million gallons as a conservative measure. (Def.'s Ex. 8.)

---

[26] The force main will be replaced as part of the project because it is made of concrete and asbestos and because it is located under Water Street. Pressure sewers will be eliminated and that flow will be contained in the pump station.

[27] Mr. Kinney agreed that the storm would generate 2 million gallons during the storm event and the pump could discharge all the stormwater but not at the peak moment, which could last for only a few minutes. (Pls.' Ex. 19 at 5-9.)

[28] The capacity of the two pump stations that will be replaced was 2.5 million gallons per day. The limitation of the discharge of the force main was not changed.

26

In 2006, the sewer rate increased by 7% and the stormwater rate increased by 30%. (Def.'s Ex. 4 at ES-1.) The significant stormwater increase was intended to generate revenue for the Bond Brook project and was based on the 100% allocation of the Rail Trail and Bond Brook projects to stormwater. Although Mr. Tarbuck did not recall discussing with Harold Smith the change in allocation of the project in 2011, the recommended change was discussed with the Board.

The City of Augusta previously was charged for all the impervious areas of the city streets but the policy was changed. (Def.'s Ex. 2 at 34.) The City of Augusta is GAUD's largest stormwater customer in terms of payments.

In May 2011, early analysis provided a net rate increase of approximately 34%. (Pls.' Ex. 21.) An early estimate at that time included a 21% increase for sewer 48% rate increase for stormwater. (Pls.' Ex. 21 at 624.) Certainly there was concern that the City of Augusta would react negatively to that stormwater rate increase.[29] (Pls.' Ex. 21 at 1; Pls.' Ex. 22.) Ken Knight, the chair of the Board, shared this concern. (Pls.' Ex. 22.) He concluded, however, "we need to make decisions that work for the majority of the people and not just one or two." (Pls.' Ex. 22.) A consulting firm was hired to assist in GAUD's communication with the public and the City of Augusta regarding the rate increases. (Pls.' Exs. 22, 28; Def.'s Ex. 2 at 66.)

II. CONCLUSIONS

a. Standard of Review

When reviewing governmental action under M.R. Civ. P. 80B, the Superior Court reviews the operative decision of the municipality for "abuse of discretion, errors of law, or findings not supported by the substantial evidence in the record." Camp v.

---

[29] In 2004, the City of Augusta attempted to take over the Augusta Sanitary District and the Augusta Water District; the two districts opposed that effort.

Town of Shapleigh, 2008 ME 53, ¶ 9, 943 A.2d 595 (quoting McGhie v. Town of Cutler, 2002 ME 62, ¶ 10, 793 A.2d 504). The court defers to the agency below in those areas within its expertise. Green v. Comm'r. of Dep't. of Mental Health, 2001 ME 86, ¶ 9, 776 A.2d 612; see Guilford Transp. Indus. v. Pub. Util. Comm'n, 2000 ME 31, ¶ 11 n.4, 746 A.2d 910 (court does not defer to agency's interpretation of a statute or legal doctrine beyond the agency's expertise).

In order to prevail, the plaintiffs must prove that the record "compels the contrary findings the appellant asserts should have been entered." Quiland, Inc. v. Wells Sanitary Dist., 2006 ME 113, ¶ 16, 905 A.2d 806. The fact that "the record contains evidence inconsistent with the result or that inconsistent conclusions could be drawn from the evidence does not render the [agency's] findings invalid if a reasonable mind might accept the relevant evidence as adequate to support the [agency's] conclusion." Mack v. Mun. Officers of the Town of Cape Elizabeth, 463 A.2d 717, 720 (Me. 1983).

b. Standing

GAUD renews its argument that the plaintiffs have no standing to appeal GAUD's 8/15/11 decision because they were not parties or participants in the administrative proceedings. (Def.'s M. to Dismiss; Pls.' Opp. to M. to Dismiss.); see Friends of Lincoln Lakes v. Town of Lincoln, 2010 ME 78, ¶ 8, 2 A.3d 284.

The court concludes, as before in denying the motion to dismiss, that the plaintiffs have standing. See M.R. Civ. P. 80B(a)[30]; Friends of the Earth, Inc. v. Laidlaw Env't Serv., 528 U.S. 167, 181 (2000); Halfway House, Inc. v. City of Portland, 670 A.2d 1377, 1381 (Me. 1996); (Pls.' Am. Compl. ¶¶ 1-6, 13, 21, 27, 40.)

28

c. Trial of the Facts

A trial of the facts was held over GAUD's objection. GAUD argues that the record of proceedings is the record on appeal. (Def.'s Ex. 2.) GAUD argues that the GAUD Board did not consider the evidence presented at trial and the evidence does not appropriately supplement the record as required by Rule 80B(d). (Def.'s Br. at 4); M.R. Civ. P. 80B(d).

The plaintiffs argue that a trial of the facts was necessary to show GAUD's biased ulterior motive to appease its largest stormwater customer, the City of Augusta, by setting rates more favorable to stormwater customers at the expense of sewer customers. (Pls.' Br. at 8.) The plaintiffs argue further that the record was grossly inadequate to permit review and understanding of the rate increase approved by GAUD's Board of Trustees. (Pls.' Br. at 8.)

"The purpose of Rule 80B(d) is to allow the parties to an appeal of a governmental action to augment the record presented to the reviewing court with those facts relevant to the court's appellate review of agency action. Rule 80B(d) is not intended to allow the reviewing court to retry the facts that were presented to the governmental decisionmaker . . . Rather, it is intended to allow the reviewing court to obtain facts *not in the record* that are necessary to the appeal before the court." Baker's Table v. City of Portland, 2000 ME 7, ¶ 9, 743 A.2d 237 (emphasis in original).

In moving for a trial of the facts, the plaintiffs consistently argued that a trial was necessary because the record did not permit the court to determine whether GAUD's allocation of costs was equitable as required by its charter. (Pls.' M. for a Trial 2, 4-6; Pls.' Reply in Supp. of M. for Trial 1, 3-6.) The plaintiffs argued further that GAUD's

---

[30] If party status is required, the City of Hallowell, Janis Cross, and Dorothy Mithee participated sufficiently before the Board. See New England Herald Dev. Grp. v. Town of Falmouth, 521

decision was arbitrary and capricious because "it lacked any foundation in proper ratemaking principles." (Pls.' Reply in Supp. of M. for a Trial 4.)

The court agrees with GAUD that the issue of bias and motive was not included in the offer of proof made in support of the plaintiffs' motion for a trial of the facts. (See Pls.' M. for a Trial and Reply in Support of M. for a Trial.) In fact, in response to GAUD's opposition to the motion for a trial of the facts, the plaintiffs argued that "[t]he District erroneously suggests that such trials are only allowable upon allegations of bias on the part of the governmental decision maker or to adjudicate timeliness of an appeal. Such a limitation on trials of facts under Rule 80B(d) has no basis in the rule or in case law." (Pls.' Reply in Support of M. for a Trial 4-5; Def.'s Opp. to M. for Trial of the Facts 2-3.)

The court granted the plaintiffs' motion for a trial of the facts to permit meaningful review of the rate model. The testimony at the trial aided in the court's review of that model and the plaintiffs' objections to the model. But the inclusion of the plaintiffs' revisions to the allocation factors, revisions to the increase in rates, and a suggested amount and method to refund sewer customers is perplexing. Certainly the court could not, and was not initially asked to, adopt those revisions to the allocation factors or the rate increases, or order a refund. The plaintiffs requested in the amended complaint that the court stay implementation of the new rates, vacate the 8/15/11 decision, and order, on remand, that the Board "establish objectively verifiable and rational methodologies for fair allocation of the Bond Brook CSO project as well as all of the District's other wastewater expenses and capital improvements." (Am. Compl. at 7.)

A.2d 693, 695-66.

d. The Rate Model

Although the plaintiffs now allege inappropriate favoritism and a biased ulterior motive on the part of the defendant, the record, including the testimony and even an internal e-mail from Mr. Tarbuck, reflects that the rate model was independently created by Raftelis.[31] (Pls.' Br. at 7-8; Pls.' Ex. 28.) Data was collected and supplied by GAUD but GAUD did not know how the data would be used and did not dictate the result.

The court concludes that Mr. Smith and Mr. Tarbuck have more experience and knowledge with regard to GAUD's system than the plaintiffs' experts. This is particularly true with regard to the Bond Brook project. Contrary to the testimony of the plaintiffs' experts, the Bond Brook system was not intended to increase the capacity of the Bond Brook collection system to 22.1 million gallons per day.

i. Allocation Factor F

GAUD concedes the numbers provided to Mr. Smith for this allocation factor, based on the number of accounts, are incorrect. GAUD's alternative theory, presented by Mr. Tarbuck, based on the amount of employee time devoted to billing, is supported by the evidence in the record. The allocation was reviewed and discussed internally with employees in the billing department before the lawsuit was filed. The employees determined the allocation was reasonable. Additionally, other costs incurred by GAUD are sewer related.

ii. Allocation Factor G

The information for this allocation factor was provided to Raftelis by, among others, a 28-year employee of the District. The calculations made by Mr. Grove were

---

[31] "The way the model is developed is very clean, easy to understand, and hard to find fault with. Where it was independently created is also helpful." (Pls.' Ex. 28.)

31

based on data from this system maintained from January 2000 until May 2011 and on his best judgment after 28 years as manager of the treatment plant. Mr. Smith used the information provided and his best professional judgment to determine the flow of sewer and stormwater at the treatment plant. Further, the plaintiffs' proposal to apply a figure for I & I to the GAUD system from a different system in Hallowell does not appear appropriate on this record.

### iii. Allocation Factor H

In both the 2006 Long Term Control Plan and in the 2011 rate model, the independent engineers determined that the Bond Brook project addressed requirements of both sewer and CSO abatement. GAUD built a 2.5 million gallon per day system. During the one year, two hour wet weather event design used for the project, approximately one millions gallons per day of rain flow would be collected in the system. The evidence at trial supports that conclusion that, except for the Mill Park storage facility, the project costs should be allocated between sewer and stormwater as provided in the rate model.

### iv. 8/15/11 Decision

As Mr. Tarbuck stated with regard to the rate model, "I'm certain there are other alternatives. This is the one we used." (Tr. at 401.) The plaintiffs present alternatives, which are not as well supported by data specific to the GAUD system and to the Bond Brook project as the rate model submitted to the Board by GAUD. The fact that there are other alternatives, presented now by the plaintiffs but not to the Board, does not compel a finding that the methodology and resulting allocation factors adopted by the Board must be rejected. As the parties seeking to overturn the decision of 8/15/11 GAUD, the plaintiffs have failed to sustain their burden of persuasion. Mack, 463 A.2d at 720. In approving the 2011 rate model in its 8/15/11 decision, the Board did not

32

abuse its discretion, make errors of law, or make findings not supported by substantial evidence in the record. The rate model, approved in the decision, complies with GAUD's charter.

The entry is

> The 8/15/11 Decision of the Greater Augusta Utility District is AFFIRMED.

Date:  March 18, 2013

Nancy Mills
Justice, Superior Court

F

Date Filed __9/14/11__ __Kennebec__ Docket No. __AP11-52__
County

Action ___Petition for Review___
80C

# J. Mills

City of Augusta - Intervenor

City of Hallowell & Hallowell Citizens   vs.   Greater Augusta Utility District

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| William Harwood, Esq.<br>One Portland Square<br>Portland Maine 04112 | Lee Bragg, Esq. (GAUD)<br>P.O. Box 5957<br>Augusta Maine 04332<br><br>Stephen Langsdorf, Esq. (City of Augusta)<br>PO Box 1058<br>Augusta, ME 04332-1058<br>- Michael Hodgins, Esq.<br>N. Joel Moser, Esq.<br>PO Box 5057<br>Augusta Maine 04332-5057 |

| Date of Entry | |
|---|---|
| 9/14/11 | Petition for Review, filed. s/Harwood, Esq. |
| 9/21/11 | Acknowledgment of Receipt of summons and Complaint or Post-Judgment Motion filed. s/Bragg, Esq. |
| 9/27/11 | Motion To Specify Future Course Of Proceedings, filed 9/26/11. s/Harwood, Esq. |
| 10/6/11 | Opposition to Plaintiffs' Request for Stay and Response to Motion to Specify the Future Course of Proceedings, filed. s/Hodgins, Esq. |
| | Defendant's Motion to Dismiss Plaintiffs' Complaint with Incorporated Memorandum of Law, filed. s/Hodgins, Esq.<br>Proposed Order, filed. |
| 10/11/11 | Plaintiffs' Motion For Extension Of Time, filed 10/7/11. s/Harwood, Esq. |
| 10/12/11 | ORDER, Murphy, J. (10/11/11)<br>Plaintiffs' Motion to Extend Deadline to Answer Defendant's Opposition to Plaintiffs' Request for Stay and Response to Motion to Specify the Future Course of Proceedings is GRANTED. Plaintiffs' deadline is 10/12/11.<br>Copy to Attys Harwood and Bragg |
| 10/12/11 | Plaintiffs' Reply in Support of Their Request for Stay and Motion to Specify Future Course of Proceedings, filed. s/Harwood, Esq. |
| 10/13/11 | Unopposed Motion to Intervene, filed. s/ Langsdorf, Esq. (10/7/11)<br>Proposed Order, filed. |
| 10/18/11 | ORDER, Murphy, J. (10/17/11)<br>City of Augusta's Motion to Intervene is GRANTED.<br>Copy to Attys Harwood, Bragg, Langsdorf |
| 10/17/11 | Defendant's Response to the City of Augusta's Motion to Intervene, filed. s/Hodgins, Esq. |
| 10/25/11 | Plaintiffs' Motion for a Trial with Incorporated Offer of Proof, filed. s/Harwood, Esq. |

| Date of Entry | Docket No. AP-11-52 |
|---|---|
| ------ | Attached Exhibits A,B, filed.  Record of Proceedings, filed. |
| 10/25/11 | Plaintiff's Opposition to Defendant's Motion to Dismiss, filed. Harwood, Esq. |
| 11/14/11 | Opposition to Plaintiffs' Motion for Trial of the Facts, filed. s/Hodgins, Esq. |
| 11/17/11 | Plaintiffs' Reply in Support of Their Motion for Trial, filed. s/Harwood, Esq. |
| 1/6/12 | ORDER ON MOTIONS, Mills, J. The Clerk is directed to incorporate this order into the docket by reference. Copies mailed to attys. of record. |
| 1/20/12 | Letter requesting a telephone conference, filed. s/Hodgins, Esq. |
| 1/26/12 | ORDER, Mills, J. After telephone conference: parties will agree on a proposed order and file by 2/6/12. Special assignment will be given after close of discovery. Copies to attys. of record. |
| 1/30/12 | Plaintiff's Uncontested Motion to Amend Complaint, filed. s/Harwood, Esq. Proposed Order, filed. |
| 2/1/12 | Entry of Appearance, filed. s/Hodgins, Esq. |
| 2/3/12 | ORDER ON PLAINTIFFF'S MOTION TO AMEND THE COMPLAINT, Mills, J. No Objection. Copies to attys. of record. |
| 2/21/12 | Scheduling Order, Mills, J.  (2/7/12) Copy ty attorneys of record. |
| 3/19/12 | Plaintiff's Motion for Extension of Deadline to Designate Witnesses, filed. s/Harwood, Esq. Proposed Order, filed. |
| 3/21/12 | ORDER, Mills, J. is hereby GRANTED. Copies to attys. of record. |
| 4/17/12 | Letter regarding settlement, filed. s/Harwood, Esq. Notice of setting for 6/5/12 - 6/24 sent to attorneys of record. |
| 5/10/12 | Consented to Motion to Continue and Amend the Scheduling Deadlines, filed. s/Hodgins, Esq. Proposed Order, filed. |
| 5/17/12 | ORDER, Mills, J. Pursuant to Defendant's Motion, and there being no objection, Defendant's Motion to Continue this matter from the trial list and Amend Scheduling Order is hereby GRANTED. Copies to attys. of record. |
| 5/25/12 | Plaintiffs' Witness Designations, filed. s/Harwood, Esq. |

| Date of Entry | City of Hallowell vs. Greater Augusta Utility District |
|---|---|
| 6/15/12 | Defendant's Witness Designation of Harold Smith, filed. s/Hodgins, Esq. |
| 6/29/12 | Plaintiffs' Supplemental Witness Designations, filed. s/Harwood, Esq. |
| 7/18/12 | Motion for Extension of Deadline to File Pretrial Motions, Memoranda and Stipulation of Facts, and to Exchange Proposed Exhibits, filed. s/Harwood, Esq. |
| 7/19/12 | ORDER, Mills, J. is hereby GRANTED. The deadline for the Parties to file pretrial motions, memoranda, and a stipulation of facts, and to exchange proposed exhitibes is August 10, 2012. No objection Copies to attys. of record. |
| 8/3/12 | Plaintiffs' Motion for Protection, filed. s/Harwood, Esq. Proposed Order, filed. |

Notice of setting for 9/5, 6/12
Sent to attorneys of record

| | |
|---|---|
| 8/10/12 | Defendant's Trial Brief, filed. s/Hodgins, Esq. |
| 8/10/12 | Plaintiffs' Pretrial Memorandum, filed. s/ |
| 8/23/12 | Plaintiffs' Pretrial Memorandum (Corrected), filed. s/Harwood, Esq. |
| 9/5/12 | Non-Jury case held with the Hon. Justice Nancy Mills, presiding. William Harwood, Esq. for the Plaintiff and Michael Hodgins, Esq. for the Defendants. Tape 1589 Index 5374-7338, Tape 1590 Index 50-7233, Tape 1591 Index 51-3164. |
| 9/6/12 | Day 2 of Non- Jury trial Tape 1591 Index 3172-7232, Tape 1592 Index 51-7373, Tape 1593 Index 50-950. Court to take matter under advisement. |
| 9/12/12 | Transcript Order, filed. s/Harwood, Esq. Transcript Order mailed to Electronic Recording along with a tapes and log sheets. Copy of docket sheet mailed to attys. of record |
| 9/28/12 | Letter regarding transcript, filed. s/Gray |
| 10/12/12 | Proposed Order, filed. s/Hodgins, Esq. |
| 10/15/12 | Vol. I and II of Transcript, filed. ORDER REGARDING BRIEFING SCHEDULE, Mills, J. The Deadline for each party to file the primary brief on appeal is November 1, 2012; and Each Party may file a reply brief on or before November 15, 2012. Copies to attys. of record. |
| 11/1/12 | Defendant's Rule 80B Brief, filed. s/Hodgins, Esq. Plaintiff's Brief, filed. s/Gray, Esq. |
| 11/5/12 | Copies of Transcript Errata Sheet, filed. s/Gray |

| Date of Entry | Docket No. AP-11-52 |
|---|---|
| 11/15/12 | Reply Brief, filed. s/Hodgins, Esq.<br>Reply Brief, filed. s/Gray, Esq. |
| 1/14/13 | Letter from Atty. Harwood regarding appeal, filed. |
| 3/18/13 | DECISION AND ORDER, Mills, J.<br>The 8/15/11 Decision of the Greater Augusta Utility District is AFFIRMED.<br>Copy to Attys Harwood, Hodgins, Langsdorf, Bragg |
| 3/20/13 | Notice of removal of Record/Exhibits mailed to all attorneys. |
| 3/20/13 | Copy of Decision And Order to repositories. |